**UNITED STATES DISTRICT COURT**
**Southern District of New York**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO. 07-CR. 1191(LAP)** |
| **ANGELA HAMBLIN** | |

<u>**DEFENDANT'S SENTENCING MEMORANDUM**</u>

**I.      INTRODUCTION.**

This memorandum is submitted on behalf of Angela Hamblin, who is scheduled to be sentenced on July 9, 2009.  Ms. Hamblin entered a plea of guilty on February 6, 2009 to a three-count Indictment without a plea agreement.  By her guilty pleas, Ms. Hamblin admitted that she engaged in a scheme to defraud by preparing and using fake documents and making false statements to sell certain paintings she represented as authentic.  She also agreed to forfeit Sixty-Five Thousand Dollars ($65,000.00) in satisfaction of the single forfeiture allegation in the Indictment.

We respectfully submit that these circumstances, as well as other factors more fully discussed herein, warrant a sentence substantially below the recommended Guidelines range. We therefore urge Your Honor to impose a term of probation with conditions this Court may deem appropriate, such as home confinement and community service.

**II.      SENTENCING PROCEDURES AFTER *BOOKER.***

As the Court is aware, the United States Sentencing Guidelines are now advisory, rather than mandatory.  *United States v. Booker,* 543 U.S. 220, 244-46, 125 S.Ct. 738, 756-57 (2005); *United States v. Crosby,* 397 F.3d. 103, 113 (2nd Cir. 2005).

Sentencing judges must now "consider" the advisory Guidelines, but are also required to consider all of the other factors set forth in 18 U.S.C. § 3553(a) in determining and imposing a fair, just and reasonable sentence.  *Booker,* 543 U.S. at 245-46, 125 S.Ct. at 757; *Crosby*, 397 F.3d at 112-14.  *See also Nelson v. United States,* ---U.S.---, 129 S.Ct. 890, 892 (2009) ("The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable") (emphasis in original); *Gall v. United States,* 552 U.S. 38, 128 S.Ct. 586, 596 (2007) ("a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range…. The Guidelines are not the only consideration, however…. [T]he district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by the party"); *United States v. Bartlett,* Nos. 08-1196, 08-1197, 08-1198, 2009 WL 1577688, at *6 (7th Cir. June 8, 2009) ("A judge must respect all of the statutory criteria in order to mete out a sentence 'sufficient, but not greater than necessary, to comply with the purposes [of sentencing]'"); *United States v. Cavera,* 550 F.3d 180, 188 (2nd Cir. 2008) ("district courts have discretion to select an appropriate sentence, and in doing so are statutorily bound to consider the factors listed in § 3553(a), including the advisory Guidelines range").

"The precise weight" accorded any 18 U.S.C. § 3553(a) sentencing factor (including the advisory Guidelines themselves) rests within the "discretion" of the sentencing court, and the Second Circuit "will not second-guess that determination in reviewing an otherwise reasonable sentence." *United States v. Marshall,* 186 Fed. Appx. 125, 128 (2nd. Cir. 2006) (citing *United States v. Florez,* 447 F.3d 145, 157-58 (2nd Cir. 2006)).  See also *Gall*, 128 S.Ct. at 597 (appellate courts "must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify" a non-Guidelines sentence); *United States v. Adelson,* 301 Fed.

Appx. 93, 95 (2nd Cir. 2008)(Affirming a wide variance from the advisory Guidelines because the district court's "decision to impose a below Guidelines sentence was not a failure or refusal to recognize the Guidelines, but rather a carefully considered reliance on the Section 3553(a) factors").

Significantly, this Court is empowered, when imposing sentence, to consider its "own sense of what is a fair and just sentence under all the circumstances." *United States v. Jones,* 460 F.3d 191, 195 (2nd Cir. 2006). See also *Bartlett,* 2009 WL 1577688, AT *6 ("The [Supreme] Court held…that a judge need not to accept the Sentencing Commission's penological framework. The court may adopt its own"); *Cavera,* 550 F.3d at 188-89 ("A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime…. District judges are, as a result, generally free to impose sentences outside the "range of imprisonment recommended by the advisory Guidelines"); *United States v. Innarelli,* 524 F.3d 286, 292 (1st Cir. 2008) (once the advisory Guidelines range is calculated, "sentencing becomes a judgment call for the court, and the court may construct a sentence varying from the [Guidelines] based on a complex [set] of factors whose interplay and precise weight cannot even be precisely described") (internal citations and quotations omitted).[1]

In instructing on the practical application of *Booker,* the Second Circuit directed that sentencing courts should: (1) determine the applicable advisory Guidelines range; and then (2) determine, based on all the factors set forth in 18 U.S.C. § 3553(a), whether to impose a Guidelines sentence or a non-Guidelines sentence. See *Gall,* 128 S.Ct. at 596-97; *Crosby,* 397

---

[1] See also *United States v. Bowles,* 260 Fed. Appx. 367, 369 (2nd Cir. 2008) (affirming a wide variance from the advisory Guidelines because the district court had "considered the sentence in light of the need for deterrence, punishment, retribution, protection of society, rehabilitation, and what would constitute the 'most appropriate fair, just, and reasonable sentence under the circumstances'"); *United States v. Contreras,* 247 Fed. Appx. 293, 295-96 (2nd Cir. 2007) (affirming the imposition of a non-Guidelines sentence because the court properly considered all of the 18 U.S.C. § 3553(a) factors).

F.3d at 113.  Significantly, if this Court "conclude[s] that two sentences equally serve[] the statutory purposes of § 3553(a), it [cannot], consistent with the parsimony clause, impose the higher."  *United States v. Ministro-Tapia,* 470 F.3d 137, 142 (2nd Cir. 2006).

We respectfully suggest that the principles embodied in *Booker, Gall, Crosby* and their progeny provide Your Honor with sufficient discretion to fashion the individualized variant sentence that we have recommended in this case.

## III.   CHARACTER AND PERSONAL HISTORY.[2]

Angela Hamblin stands before the Court a broken and humbled woman, who has suffered dramatically since the inception of the investigation and prosecution of this case.  She was born and raised in post-World War II Britain, the only child of Bernard and Catherine Edwards.  Mr. Edwards, a Patent Engineer, strove to provide for his family in the challenging post-war economy, and his closely-knit middle class family thrived. The Edwards family relocated to Scotland, where they initially operated a hotel and later embarked upon an antiquities/fine arts business, dealing in furniture, porcelain, and glass.  Their hard work ensured their success, and they expanded into regional antique shops, galleries, and in-hotel stores, sponsored art exhibitions and shows on a regular basis, and developed affiliations with various interior decorators.

After high school, Ms. Hamblin completed a one-year program in Business Studies at Aberdeen College of Commerce and participated in a home studies course, leading to a Bachelor of Arts degree.  She worked at the Scotsman Newspaper before joining her parents' business in 1974, acting as a Director in the various family business ventures through 1982, primarily overseeing inventory purchases. During this time, she also served as Member and Chairman of

---

[2] See personal letters from Angela and Michael Hamblin, attached hereto as *Exhibit 1.*

the Independent Broadcasting Authority Advisory Committee for Scotland, a position charged with oversight of regional television and radio broadcasting.  She was also involved on a volunteer basis in raising funds for Save the Children and The Royal Blind School, organizing and taking part in events at universities and other locations. In November 1982, Angela Edwards married Michael Hamblin, a young man with a Ph.D. in Organic Chemistry.  Her parents retired that year and the family businesses were sold, though the Edwards' retained an inventory of "stock" items, with the intention to sell those items to supplement their retirement income in the future, in the event their savings proved inadequate.

        Michael's career as a laboratory researcher took them to various locations, including Cambridge and Edinburgh.  During this time, she was able to maintain the close personal contact she had always had with her parents. Ms. Hamblin fell back on her business expertise and, in 1987, she operated a Crabtree & Evelyn franchise on the south coast of England, with three branches in Brighton, Brighton Pier, and Eastbourne.  Over time, Michael gravitated professionally into medical research and in 1994, he was offered, and accepted, a fellowship to conduct research at Massachusetts General Hospital, under the auspices of Harvard University Medical School and the Hamblins moved to the United States.

        During her time in the United Kingdom, Ms. Hamblin had maintained almost daily contact with her parents, and was saddened that her husband's career opportunities would move her away from them.  As others their age, her parents experienced various medical afflictions, each becoming increasingly frail. Again, Ms. Hamblin experienced conflicting emotions, pleased by her husband's career successes and deeply saddened by her further separation from her parents at a time when they seemed to need her even more.

The Hamblins set up house in an apartment on Ocean Avenue in Revere, Massachusetts. Ms. Hamblin did not secure regular work outside the home between 1994 and 2002. She was in possession of a J2 Visa that, unlike a Green Card, made it more difficult secure full time employment. She and her husband did not obtain Green Cards until 2002. During this time, she sold antique textiles at auction houses in New York and to private buyers, drawing upon contacts and her prior experience in the art world. In 2004, Michael and Angela Hamblin decided to buy a home in Revere and moved to Revere Beach Boulevard, where they still reside. This purchase added significantly to the couple's debt burden and Michael insisted that Angela increase her contribution to the family income to help offset their increased obligations.

During a visit to her parents, Ms. Hamblin was given folios from the "stock" inventory and, once her involvement in the textile trade diminished, she began to sell a few of her own paintings on eBay and soon added some of the aforementioned folios. This activity increased commensurate with her parents' need for financial assistance. Unfortunately, by 2004, the increasing obligation to her parents combined with her own financial needs and caused her to resort to the conduct that is the subject of this prosecution.

Shortly after what would be her last visit with her parents in December 2006, Ms. Hamblin learned that her mother had rectal cancer. Her father by that time had suffered several strokes and their combined health conditions became exceedingly worrisome. After her arrest in 2007, Ms. Hamblin was no longer free to travel due to her bail conditions, nor was she able to share with her parents the true reason for her continued absence from them, due to the frailty of their conditions. Thus, at the time her parents needed her most, she was unable to fulfill what she, and extended family members, considered her duty to provide care and assistance to them. For many years, her mother had written letters to her with news of home but, as she became

more seriously ill, she was not able to write as frequently.  Ms. Hamblin instead wrote to her,

long letters about happy times in the past, but never any mention of the troubles in her own life,

including her arrest and prosecution, Michael's precarious heart condition, and her own

mounting anxiety and increasing episodes of atrial fibrillation.  In March of this year, Ms.

Hamblin was notified that her father had suffered a ruptured heart valve and, being too weak to

survive a surgical option, had only hours to live.  Her mother, who had been in and out of the

hospital frequently, was in serious decline and was actually in hospital at the time her husband

was stricken.   By the time Ms. Hamblin had sought and secured permission from the Court to

travel to Scotland, her father had passed away and days later, her mother died as well.

   The tragedy of Ms. Hamblin's situation was compounded by the fact that her parents'

estate was so depleted that there were insufficient funds to adequately cover their care and

subsequent funerals.  Thus, in addition to dealing with her overwhelming personal loss, Ms.

Hamblin was, and continues to be, personally responsible for the costs associated with an estate

in total disarray.  Her physician, Sandra Sweetnam, M.D., has opined that Ms. Hamblin has

experienced stressors well beyond the norm and, as a result, finds her to be "very fragile" and

further states that any exacerbation of her current state of health is "particularly risky." For these

reasons, and because of the incredible personal tragedies she has sustained since her arrest, Ms.

Hamblin begs Your Honor to be merciful in determining a sentence that will satisfy the needs of

justice, while recognizing her serious health concerns and those of her husband.

## IV. OFFENSE CONDUCT.

   The facts underlying Angela Hamblin's conduct are set forth in the PSR, subject to

certain objections to the report that may remain unresolved at the time of sentencing.  These

objections are discussed more fully below.

During her allocution and in her statement to the Probation Department, she acknowledged her dishonest actions and expressed her sincere remorse.  In her letter to Your Honor, Angela Hamblin has expressed contrition and has assumed responsibility for her conduct.  She candidly states that, what began as a small enterprise of purchasing and selling paintings on eBay, evolved into the unlawful conduct that brings her before this Court.  She foolishly and inexcusably allowed herself to succumb to the increased financial pressure engendered by her elderly parents' worsening financial condition and her husband's insistence that she contribute significantly to the cost of the apartment they purchased in 2004.

In light of all the personal tragedy she has suffered since her criminal conduct, this entire matter seems like a nightmare from which she cannot awake.  Nonetheless, she has commenced therapy with Sylvia Gordon, LICSW to cope with the guilt of not "being there" for her parents in the final months of their lives and with the grief their recent deaths have caused her.  She is also committed to paying her forfeiture obligation in full as soon as possible and will be making a substantial payment prior to sentencing.  This payment will be applied toward the restitution recommended in the PSR.

## V.     GUIDELINES CALCULATION.

### Loss Amount.

The Addendum to the PSR indicates that the loss for purposes of calculating the Guidelines offense level is $654,000.  PSR, Paragraph 46.  The parties have since resolved more of the original objections to this figure, resulting in a total loss amount of $621,673.  However, certain objections remain extant.  Specifically, we object to the intended loss figures of $45,000.00 for the Turner painting and $85,000.00 for the Kline paintings.  As noted in Paragraph 38, these figures are evidenced by two unexecuted "broker agreements" allegedly e-

mailed to Ms. Hamblin by the government's cooperating witness (CW) on or about March 21, 2007, the date noted in the body of each agreement.[3]  However, as described in Paragraphs 39 and 40 of the PSR and in our written objections to the PSR, these unsigned contracts were not attached to any of the e-mails obtained by the government's subpoena to the Excite service provider used by Ms. Hamblin in connection with this case.  Rather, they were forwarded by the CW to the FBI from the CW's computer several weeks after the date on which the e-mails and contracts were purportedly sent.

On June 6, 2007 the CW also forwarded an e-mail of the same date he purportedly wrote and sent to Ms. Hamblin, attaching "the two agreements that I promised."  This e-mail, which was not obtained pursuant to the Excite subpoena, was sent weeks after the dates on the agreement and appears not to have had any attachments.  The government, which has the burden of proof on this issue, has proffered no explanation for these discrepancies.  Without proof that Ms. Hamblin received these contracts and agreed to the CW's proposed sale prices, the documents are insufficient to establish the proposed intended loss figures for the Kline and Turner paintings.

We also maintain our objection to the Shaw painting described in the Relevant Conduct chart contained in Paragraph 45 of the PSR.  We have been advised by Shannon Galleries Fine Art Auctioneers that they sold the painting at auction and stand by its authenticity.  We believe that the government's evidence is insufficient to prove otherwise.

Should these objections be sustained, the total loss will be reduced to $475,673, with an actual loss of $177,173.

---

[3] Copies of these unexecuted agreements and e-mail are contained in *Exhibit 2* to this Memorandum.

## VI.     THE OFFENSE LEVEL SUBSTANTIALLY OVERSTATES THE SERIOUSNESS OF THE OFFENSE.

The Guidelines measure the seriousness of fraud offenses by the amount of gain or loss. Yet there is often a disconnect between: (1) the range of imprisonment indicated by the loss amount; and (2) the defendant's personal culpability as reflected by the nature and circumstances of an offense.  See *United States v. Ranum,* 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005)(Court "varied" from the applicable Guidelines range and stated that "[o]ne of the primary limitations of the guidelines, particularly in white-collar cases, is their mechanical correlation between loss and offense level…. {F}rom the victim's perspective the loss is the same no matter why it occurred. But from the standpoint of personal culpability, there is a significant difference"); *United States v. Emmenegger,* 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004) ("Were less emphasis placed on the overly-rigid loss table, the identification of different types of fraud or theft offenses of greater or lesser moral culpability or danger to society would perhaps assume greater significance in assessing the seriousness of different frauds").[4]

Application note 19(C) of Section 2B1.1 provides, "There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense.  In such cases, a downward departure may be warranted."  U.S.S.G. § 2B1.1, cmt. n. 19(C)).  We respectfully suggest that this is such a case. Indeed, 14 of the 20 "points" that

---

[4] See also *United States v. Adelson,* 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) ("the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as …the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors"); *United States v. Biheiri,* 356 F. Supp. 2d 589, 594 (E.D. Va. 2005) ("fashioning a just sentence cannot be reduced to a mere arithmetical exercise.  Reliance solely on numbers, quantities, offense levels, criminal history categories, and matrices produced an illusory precision that obscures the fact that sentencing, in the end, must involve the exercise of *judgment, i.e.,* a judge's discerning opinion tha results from identifying and weighing fairly all of the factors relevant to achieving the statutory sentencing goals") (emphasis in original); Hon. Myron H. Thompson, Editorial, *Sentencing and Sensibility,* N.Y. Times, Jan. 21, 2005 ("If the 600-plus pages of the most recent set of sentencing guidelines have taught us anything, it is that punishment cannot be reduced to an algorithm").

comprise Ms. Hamblin's advisory Guidelines offense level are based upon the "total intended loss" calculation of $654,000.  PSR at Paragraph 46.  The parties recently resolved objections, reducing this figure to $621,673.  However, as detailed above, we contend in our remaining objections to the PSR that this figure (either $177,173 or $193,173) is incorrect and unsupported by the evidence.  More importantly, the actual loss is substantially less, regardless of the ultimate resolution of the remaining objections.  This substantial disparity warrants a downward departure or, alternatively, a variant sentence.

Similarly, there exists a substantial disparity between the total number of victims and those who suffered actual losses in this case.  As noted in the Addendum to the PSR, we also objected to the two-level enhancement pursuant to U.S.S.G. § 2131.1(b)(2)(A), on the ground that there were fewer then ten victims who incurred "actual loss," as required under the definition of "victim" in the Guideline.  We have since resolved all but one objection, resulting in 13 victims who suffered actual loss and, therefore, this enhancement applies.  However, it was agreed that the total number of victims is 18, rather than the 34 victims noted in the PSR.  Moreover, 5 of the total victims had either never made payment, or had their payment returned.  We respectfully suggest that this discrepancy also warrants a downward adjustment of Ms. Hamblin's sentence.  § 2B1.1 cmt. n. 1 and n. 3(A)(i) and (iii).

## VII.   SENTENCING FACTORS.

T. 18 U.S.C. § 3553(a)(2) requires that a sentence be "sufficient but not greater than necessary" to reflect the following purposes:

### A.   Seriousness of the offense, respect for the law, and just punishment.

Angela Hamblin readily acknowledges the seriousness of her conduct and that there is no excuse for her actions.  Nonetheless, the foregoing demonstrates that her crimes were

due, in large part, to unforeseen financial demands engendered by the increasing needs of her elderly and ill parents and by her husband's expectation that she contribute in greater measure to the cost of furnishing and maintaining the home they purchased in 2004.  Thus, unlike many other charged with similar offenses, Ms. Hamblin did not commit the offense to fund a lavish lifestyle.

We respectfully suggest that a sentence of home confinement, followed by a substantial term of probation, would be just punishment in this case.  Though technically non-custodial, such a sentence would seriously restrict Ms. Hamblin's liberty, in that she could only leave such confinement for work, healthcare, or to attend religious services.  Probation would prohibit her from leaving her judicial district, moving or changing jobs without permission from her probation officer, and subject her to several additional rigid conditions.  See *Gall,* 128 S.Ct. at 595; *United States v. Munoz-Nava,* 524 F.3d 1137 (10th Cir. 2008).  She will have the additional stigma of multiple felony convictions and will bear the burden of fulfilling her forfeiture commitment and any restitution this Court may order.  That said, in some respects, the monetary sanctions have been less burdensome a punishment than the personal disgrace that has befallen her as a consequence of her actions.  Another consequence of her conviction is that, as a permanent resident, she ultimately faces probable, if not certain, deportation and the attendant complications of rebuilding her life in the United Kingdom after fifteen years in this country.  The impact of deportation on her husband's career is a further serious concern.  Finally, she has suffered public humiliation and has begun the process of self-inflicted punishment that a person of previously unblemished character often undergoes.

The mere fact of prosecuting a woman of Ms. Hamblin's background promotes respect for the law by making it clear that no one is above the law, regardless of their standing in

the community.  <u>See</u> *United States v. Baird,* 2008 U.S. Dist. Lexis 2338 (D. of Nebraska, January 11, 2008).  Our recommended sentence also addresses this concern because, as observed by the 11th Circuit in *United States v. Williams,* 435 F.3d 1350, 1352-1353 (11th Cir. 2006): "…a sentence … out of proportion to the conduct does not promote respect for the law but actually promotes disrespect for the law."

**B.**      **<u>Deterrence and Public Protection.</u>**

Angela Hamblin's sincere remorse, acceptance of responsibility, and lack of a criminal record establish that specific deterrence has been accomplished in this case.  A sentence of incarceration therefore is unnecessary to protect the public or to guarantee her future compliance with the law.  In its paper, *A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score* (January 4, 2005), the Sentencing Commission determined that an offender's lack of prior involvement with the criminal justice system is a powerful predictor of a reduced likelihood of recidivism, which is something the Guidelines themselves do not take into account.  Indeed, the Guidelines prohibit a departure below the applicable range from Criminal History Category I, U.S.S.G. § 4A1.3(b)(2).  Nonetheless, Congress directed the Commission at an early stage of the Guidelines to ensure that the "guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or otherwise serious offense."  28 U.S.C. § 944(j).

The Commission has initiated several workshops to refine a workable "First Offender" concept within the Guidelines, but has not yet done so.  Nevertheless, it has concluded that "offenders with zero criminal history points have lower recidivism rates than offenders with one or more criminal history points. *Recidivism and the First Offender* at 17 (May 2004).  Thus,

incarceration is unnecessary to protect the public or to guarantee Ms. Hamblin's future compliance with the law.  Moreover, the factors noted above that ensure respect for the law are equally effective to accomplish general deterrence.

C.     **Medical Care.**[5]

As detailed above, Angela Hamblin suffers from physical and emotional afflictions that have been exacerbated by this prosecution.  Her treating physician, Sandra M. Sweetnam, M.D., has expressed her serious concern that incarceration would be "particularly risky" for Ms. Hamblin, in that it would "push her anxiety disorder in a dangerous direction" and "probably" cause her cardiac condition to worsen.  Her therapist, Sylvia E. Gordon, LICSW concurs in Dr. Sweetnam's observations and, therefore, strongly advocates for "an alternative sanction" as well.  We expect the government to contend that adequate care will be available to Ms. Hablin in a federal correctional facility, but I urge Your Honor to consider Dr. Sweetnam's contrary opinion.

Our recommended sentence will ensure that Ms. Hamblin can continue in treatment with Dr. Sweetnam and Ms. Gordon for the duration of the term of probation, even with a condition of home confinement.

VIII.  **KINDS OF SENTENCES AVAILABLE AND NEED TO PROVIDE RESTITUTION.**

Probation is available in this case and such a sentence will enhance Ms. Hamblin's ability to complete her agreed upon forfeiture obligation and to make any restitution that may be ordered.

---

[5] See letters from Sandra M. Sweetnam, M.D. and Sylvia E. Gordon, LICSW, attached hereto as *Exhibit 3*.

**IX.      NEED TO AVOID UNWARRANTED DISPARITIES.**

T. 18 U.S.C. § 3553(a)(6) requires a sentencing judge to consider the need to avoid

unwarranted sentencing disparities among similarly situated defendants.  Justice Stevens

addressed this factor in weighing the reasonableness of the sentence in *Gall v. United States,*

*supra,* as Gall's probationary sentence was considerably more lenient than those of his co-

defendants and others convicted of similar crimes throughout the country.  In affirming the

sentence, Justice Stevens countenanced the district judge's reasoned opinion as a valid basis for

treating him with less severity than his co-defendants.  In so ruling, he opined that a sentencing

court must consider both the need to avoid unwarranted disparities and "to avoid unwarranted

*similarities* among co-conspirators who were not similarly situated."

128 S.Ct. at 599 (emphasis in original).

Several district judges have also commented on the danger inherent in equating

compliance with the admonition to avoid unwarranted disparity with fealty to the Guidelines.

See *United State v. McGee,* 479 F.Supp2d. 910, 912 (E.D. Wisc. 2007) (Courts must be careful,

post *Booker,* not "to reimpose mandatory or near mandatory guidelines under the guise of

avoiding disparity.");  *United States v. Jabar,* 362 F.Supp2d. 365, 375 (D.Ma.) ("Differences

justified by differences among offenses and offenders are warranted differences.").

Defendants convicted of financial crimes have been sentenced to probation or to

substantial variant sentences in cases similar to the instant case.  In *United States v. Wadena,* 470

F2d. 735 (8th Cir. 2006), the defendant pleaded guilty to mail fraud in connection with a scheme

to artificially inflate the value of salvage or junk automobiles.  There were sixteen identifiable

victims, including one who was injured in an accident in one of the junk vehicles whose airbag

did not deploy.  Despite a prior conviction for fraud and money laundering and a Guidelines

range of 18 to 24 months, the district court imposed a variant sentence of five years probation

and restitution, noting that the defendant was 67 years old and had serious health conditions,

including hypertension, hearing loss, and kidney disease.  The court further considered

defendant's role as sole caretaker for his son, who suffered from fetal alcohol syndrome.  The

Eighth Circuit rejected the government's contention that the variance was excessive,

emphasizing that Wadena's age, health condition, and family responsibilities provided a

sufficient basis for the sentence and, when combined with the terms of his probation, were

adequate to reduce the risk of reoffending.

     The facts and circumstances, which formed the basis for the downward variant sentence

imposed in *United States v. Cole,* Case No. 5:08-cr-327 (N.D. Ohio December 12, 2008) also

bear on this Court's sentencing decision.[6]  Cole pleaded guilty to insider trading based upon

information he obtained while employed by Diebold, Inc.  He realized over $500,000 in profit,

which he eventually disgorged as part of the resolution of the case.  Despite an advisory

Guidelines range of 30-37 months, Judge Gwin sentenced Cole to a variant sentence of a year

and a day, a fine, and a term of supervised release.

     The Court's analysis of the sentencing factors apply equally here.  As in this case, the

parties agreed that Cole's unlawful actions amounted to serious fraudulent conduct that, standing

alone, should be punished significantly.  However, it noted that neither rehabilitation nor

incapacitation were implicated in Cole's case, due to his age (66 years), several physical

maladies, and his lack of prior criminal record.  Similarly, Ms. Hamblin has no prior criminal

history, is of like age, and suffers from both a serious heart condition and depression due to the

recent loss of her parents.  As Cole did, she has also agreed to remit $65,000.00 as settlement of

---

[6] A copy of Judge James S. Gwin's unpublished Sentencing Memorandum is attached hereto as *Exhibit 4.*

the forfeiture allegation, which is her share of the restitution to be paid to Jeffrey Bergin, as noted in the PSR.  See PSR, p. 30.[7]

Judge Gwin's analysis of the dual functions of deterrence is also instructive.  The Court first considered the need to impose punishment in order to deter Cole himself from future criminal conduct.  On the basis of Cole's background and history, the Court found little risk that Cole would reoffend due to his age, termination from the employment where the insider trading information was available, and the fact that he had no criminal history.  However, the Court found the concept of general deterrence more difficult to calculate, as it inherently pits individual dignity against the good of society as a whole and relies upon potential inefficiencies that have adverse economic impacts, such as increased penalties and increased rates of imprisonment.  As a result, Judge Gwin concluded that the downward variant sentence he imposed satisfied this sentencing purpose.

In the instant case, Ms. Hamblin is of similar age to Cole; her standing in her community has been irreparably damaged by her guilty plea and her admission of fraudulent activity; and she has no criminal history.  Thus, her risk of reoffending is low.  Incarceration of Ms. Hamblin may possibly be a deterrent to others, but the costs associated with the incarceration of a person of her age and fragile health greatly outweigh its benefit as a deterrent.  Finally, the actual loss to her victims was significantly less than Cole's, which mitigates against incarceration in this case.

## X.   CONCLUSION.

*Booker, Gall* and their progeny and the parsimony provision of 18 U.S.C. § 3553(a) dictate that a sentence must be sufficient, but not greater than necessary "to achieve the purposes

---

[7] Mr. Bergin is the "Gallery President" who purchased the Avery painting from the CW, now identified as Joseph A. Kinney, who has filed a Victim Impact Statement.  Kinney has refused to pay restitution to Bergin, citing his interpretation of North Carolina law.  For purposes of sentencing, the government has agreed that Kinney is not a victim who bore a financial loss.

of punishment."  That same principle is embodied in the following observation by Justice

Stevens in *Gall*:

> "…the unique facts of Gall's situation provide support
> for the District Judge's conclusion that, in Gall's case,
> 'a sentence of imprisonment may work to promote not
> respect, but derision, of the law if the law is viewed as
> merely a means to dispense harsh punishment without
> taking into account the real conduct and circumstances
> involved in sentencing.'"  128. S.Ct. at 598

The full and fair consideration of all factors – the offense, just punishment, deterrence,

and the personal history and character of this defendant – suggest that this case is a compelling

one for the Court to exercise its discretion to fashion a sentence with all appropriate leniency.

We, therefore, respectfully urge Your Honor to impose the sentence we have recommended.

Date: July 7, 2009                           /s/ Richard S. Berne

                                             BERNE & BISCHOFF, LLC
                                             22 Free Street Suite 404
                                             Portland ME 04101
                                             207-871-7770
                                             rberne@bernebischoff.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this date, I caused service to be made of Defendant's

Sentencing Memorandum by electronic means on the following:

Seetha Ramachandran, AUSA
Southern District of New York
The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, NY 10007
Seetha.Ramachandran@usdoj.gov

Thomas J. McCarthy
United States Probation Officer
Southern District of New York
233 Broadway
New York NY 10279
Thomas_McCarthy@nysp.uscourts.gov

Date: July 7, 2009                              /s/ Richard S. Berne

                                                BERNE & BISCHOFF, LLC
                                                22 Free Street Suite 404
                                                Portland ME 04101
                                                207-871-7770
                                                rberne@bernebischoff.com