EXHIBIT
/

350 Revere Beach Boulevard, P2-13R
Revere, MA 02151

July3rd, 2009

Honorable Loretta A. Preska
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street Room 1320
New York NY 10007

Re: United States v. Angela Hamblin
07-cr-1191 (LAP)

Dear Judge Preska:

Let me first state that I am extremely sorry for the crime I have committed and I am humbled and ashamed by my behavior. I have always considered myself an honorable person and I am appalled to find myself standing before you for sentencing. I have no excuse for what I've done, but I hope you will permit me several moments to explain how I arrived in this circumstance.

My early life in the United Kingdom was a happy time. I come from a small, close-knit family and grew up in the post-War era, sharing the challenges unique to all families during that time. There was little money in our lives, but through hard work and perseverance, my parents eventually established a successful antiques business. I gained a graduate degree in Business Studies and, beginning in 1976, I was an active partner in their antiques/fine arts business based in Scotland, gaining significant practical and business experience in the Art world. In 1981 I married Michael Hamblin and the following year my parent retired and we sold the family business. In 1994, Michael and I made the move to the United States, where he accepted the position of Post Doctoral Fellow at Harvard Medical School, where he was specifically based at the Wellman Laboratories of Photo Medicine at Massachusetts General Hospital in Boston.

Both of my grandmothers had worked in Couture, and owned tailoring and retail shops in London between the First and Second World Wars. I inherited their love of textile and, beginning in 1994, I tapped into the extensive network of contacts I had made over the years in the family business and began to buy and then sell fine antique Chinese robes and textiles at the major auction houses in New York and to private buyers. I gained a reputation for high quality and was able to make a comfortable living. By 2005, however, fine quality textiles were becoming scarce and, rather than compromise my reputation, I gave up selling textiles. From that time, like many others I turned to the online marketplace on eBay, purchasing items of personal interest to me and eventually selling a small number of paintings.

When we first moved to the US, Michael and I rented an apartment in the St. George neighborhood of Revere. In 2004, we purchased our home in the same neighborhood at Revere Beach Boulevard, where we live today. That purchase put a more significant strain on our finances and I felt pressured to shoulder a greater share of the burden than I had previously. At the same time, my parents' retirement funds had dwindled significantly, causing them distress and worry, and I felt an obligation to assist them as best I could. These are not excuses for my actions, but serve to explain why I am in the situation I find my self today..

When I was arrested in October 2007, my life changed dramatically. My husband, Michael, has a serious congenital heart condition and he fell critically ill around that time, requiring emergency surgery. For most of our married life, I have dedicated myself to caring for Michael. My own health concerns, however, have become more pronounced and I have recently experienced bouts of severe Atrial Fibrillation, which has grossly impacted my ability to perform day-to-day tasks and has resulted in my ever-increasing frailty. Due to the numerous and worsening complications in my life, I have been on increasing doses of medication for an anxiety disorder and have been seeing a therapist. My parents' physical health had also deteriorated over time and during a visit in 2006, my mother was diagnosed with Rectal Cancer. My father suffered from major heart problems for many years and was only marginally capable to caring for himself, let alone my mother.

Once arrested, I was precluded from traveling to Scotland to care for my parents and I experienced terrible anxiety, unable even to share with them the cause for my absence, or the seriousness of Michael's medical condition or even my own, for fear of further impacting their already depleted health. As Your Honor may recall, my father passed away suddenly this Spring and I was permitted to travel to Scotland just in time to witness my mothers' death and begin the process of settling their estate. While there, Michael fell ill with a Gastrointestinal disease and was bedridden for a week. His condition, though improved, is still a constant worry for me.

I fully understand that I allowed myself to become overwhelmed by my personal and financial circumstances, causing me to stray from the path of honesty and truth. I will never permit myself to do so again. I beg for leniency Your Honor, so that I may care for my husband and myself. I long to be able to grieve properly for my parents, who deserved a more peaceful end than I was able to provide. I cannot do either until this matter has ended.

Very Sincerely,

Angela Hamblin

Angela Hamblin

**Wellman Center for Photomedicine**
40 Blossom Street, Bartlett 314
Boston, Massachusetts 02114-2604

Honorable Loretta A. Preska
United States District Court,
Southern District of New York
New York, NY 10007

Re United States v. Angela Hamblin
07-cr-1191 (LAP)

July 1st, 2009

Dear Judge Preska,

I am Angela Hamblin's husband of 28 years and I am writing to provide information to assist you in determining the outcome of this case.

Angela and I met and married in Great Britain in 1981 and left in 1994 so that I could accept a dual position as an Assistant Chemist at Massachusetts General Hospital, and an Instructor at Harvard Medical School. It was a difficult decision, primarily because Angela, an only child, was exceedingly close to her parents, having also worked with and cared for them for many years. As I look back, while it may have been a wise decision for me professionally, it nevertheless had an adverse emotional effect on Angela, from which I know she never fully recovered.

In early 2007 I began to suffer various symptoms such as irregular heartbeat, shortness of breath and interrupted sleep. After visiting my primary care physician I was referred to Dr Calum Macrae at MGH Cardiology Department who diagnosed a problem with my main aortic valve and the aortic root. Apparently this was a congenital problem I had been born with but which had remained non-symptomatic until late middle age. The structure of the valve had deteriorated and become calcified so that it no longer functioned perfectly and allowed arterial blood to flow backwards into the pumping chamber of the heart, a process variously known as aortic insufficiency or aortic regurgitation. This was extensively investigate with numerous tests such as transthoracic echocardiogram, computed tomography scans with IV contrast, and pulmonary function tests. They determined that not only was the aortic valve faulty, but the upper part of the aorta itself was also affected by the congenital abnormality and thereby rendered much more susceptible to the formation of aortic aneurysm and the consequent possible catastrophic rupture.

Although at that time this diagnosis was not an acute problem, the prognosis was for a further slow but irreversible decline in cardiac function and the development of cardiomyopathy and increasing the likelihood of long-term heart failure and shortened life expectancy. After some discussion about the therapeutic options Dr Macrae referred me to Dr Alan Hilgenberg one of the chief surgeons in the MGH center for aortic and heart valve replacement surgery. It was decided



  

**Wellman Center for Photomedicine**
40 Blossom Street, Bartlett 314
Boston, Massachusetts 02114-2604

that the best option consisted of replacement of the aortic valve with a manufactured synthetic replacement made out of bovine collagen. This replacement had an advantage of being longer lasting than extracted porcine valves, and not requiring the extensive anticoagulant therapy required with artificial metal and plastic valves. The aortic root section would be replaced with a Dacron graft commonly used to repair aortic aneurysms.

This major open heart surgery was carried out on Oct 19, 2007 at MGH Cardiac Surgery and lasted approximately eight hours. Post-surgery recovery took place over the next week of in-patient care with slowly increasing range of movement and exercise taking place and withdrawal of pacemakers, drains, catheters etc. A further two weeks of convalescence and recovery took place at home that would not have been possible without the continuous care provided by my wife Angela. She looked after me in every conceivable manner and I have no idea what would have happened had she not been able to do that.

Although I was able to return to work approximately three weeks after my surgery, I do not believe that my health returned to what it had been before the surgery. So although I am convinced that the surgery avoided a slow inexorable decline, it did have adverse affects on my ability to accomplish everything I would expect in everyday life. For instance combining my work directing a laboratory of 10-12 people at the Wellman Center for Photomedicine with running a household I would find quite impossible. My wife Angela carries out an essential function in arranging all domestic matters and allowing me to concentrate on research and writing grants and papers.

Furthermore I do not think that my health is particularly stable. This was exemplified in April this year when my wife was in Scotland attending to her parents deaths. I contracted a noravirus that causes acute gastrointestinal disease with diarrhea and vomiting. Although the virus only lasted a few days, this seemed to have a major effect when combined with my cardiac problems in that it induced irregular heartbeats that despite beta-blockers have still not returned to normal three weeks later.

Initially we rented an apartment in Revere, and in 2004 purchased an apartment in the same neighborhood at 350 Revere Beach Boulevard, where we currently live, as a result this purchase substantially increased our monthly expenses. When I asked my wife to contribute toward our new home I had no idea at the time that she was also helping her parents financially. I put her under excessive pressure to fund the furnishing of our home and substantially contribute toward the running of it in particular the high monthly maintenance charge. Bearing in mind that she was also being financially pressurized by her parents this must have been unbearable for her, and I deeply regret my actions.

My wife has always been a wonderful, caring and honorable person not only to me but to her parents and many others that she has come in contact with over these many years of our



**Wellman Center for Photomedicine**
40 Blossom Street, Bartlett 314
Boston, Massachusetts 02114-2604

marriage. I love my wife and to see her brought down so markedly by illness since her atrial fibrillation episode in 2006, and to know that I have contributed to her current poor state of health and the situation that she finds herself in today, makes me very ashamed and deeply sorry.

In conclusion I believe that my wife Angela to whom I continue to be devoted plays a major role in my continued ability to live a productive and worthwhile life, and I am not at all optimistic about how matters would turn out if she were not available to continue looking after me as she has done so excellently for the last twenty-eight years. Please your honor I beg you to show leniency toward her, so that she can properly grieve for her beloved parents and know that this terrible matter is finally at an end.

Sincerely,

Michael R Hamblin, PhD
Associate Professor, Harvard Medical School