UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                 :

       -v-                               :    07 Cr. 1191 (LAP)

ANGELA HAMBLIN                           :

               Defendant.        :
- - - - - - - - - - - - - - - - - - - - x


GOVERNMENT'S SENTENCING MEMORANDUM


                                    LEV L. DASSIN
                                    Acting United States Attorney
                                    for the Southern District of
                                    New York
                                    Attorney for the United States


SEETHA RAMACHANDRAN
Assistant United States Attorney
     - Of Counsel -



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 13, 2009

**By Hand**

Honorable Loretta A. Preska
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

   Re:  **United States v. Angela Hamblin,**
       **07 Cr. 1191 (LAP)**

Dear Judge Preska:

  This case is scheduled for sentencing on July 14, 2009, at 2:00pm. The Government respectfully submits this letter in response to defendant Angela Hamblin's July 7, 2009 sentencing memorandum ("Sent. Memo"). Hamblin argues that she should receive a non-Guidelines sentence (specifically, a non-custodial sentence of probation or home confinement), based on (1) various objections to the Presentence Investigation Report ("PSR"), including the loss amount and the number of victims; (2) medical conditions that she claims entitle her to a downward departure or non-Guidelines sentence; and (3) the nature of the offense and history and characteristics of the defendant, under 18 U.S.C. § 3553(a).

  For the reasons explained below, the Court should (1) reject Hamblin's arguments and impose sentence within the Guidelines range of 33 to 41 months' imprisonment, based on a loss amount of more than $400,000 but less than $1 million; (2) impose restitution; and (3) enter the enclosed stipulated order of forfeiture, which the parties anticipate signing before the sentencing.

## Background

  The Indictment charges Hamblin with three counts of fraud in connection with a scheme to falsely represent that various decorative paintings were in fact original works of art by renowned artists. The three counts charged in the Indictment arise from her sale and attempted sale of four such paintings to a cooperating witness ("CW"), which she represented to be the orginal artwork

Hon. Loretta A. Preska
July 13, 2009
Page 2

of Milton Avery, Franz Kline, William Turner, and Juan Gris. Hamblin sold the Avery for $65,000, and agreed to sell the Turner, Kline, and Gris for $45,000, $85,000, and $80,000, respectively. After an agreement to sell the paintings to the CW was reached, and she sent the paintings to a storage facility in New York. She never received a payment for these paintings however, because she was arrested.

In the course of its investigation, the Government learned that Hamblin's interactions with the CW were not the first time she fraudulently represented decorative paintings to be the valuable works of famous artists. In fact, Hamblin had been carrying out her scheme for years, during which she sold some of the very same paintings that she offered to the CW to others, usually through E-bay. When these individuals discovered the works were fraudulent, they either sued or otherwise demanded a refund. The Government submits that the Court should consider such relevant conduct in sentencing Hamblin.

On February 6, 2009, Hamblin pled guilty to all three counts of the Indictment, without a plea agreement.

The Indictment contains a forfeiture allegation seeking a money judgement of $400,000. The parties have agreed, however, that a payment of $65,000 will fully satisfy Hamblin's forfeiture obligation in this case because it represents the actual proceeds of the crimes charged in the Indictment that Hamblin received.

## Argument

### A.     The Defendant's Guidelines Range is 33 to 41 Months' Imprisonment

The PSR concludes that Hamblin's base offense level is 7, pursuant to U.S.S.G. § 2B1.1(a)(1)(A) and (B). The PSR also applies a 14 level increase, pursuant to U.S.S.G. § 2B1.1(b)(1)(H), because the loss amount is greater than $400,000 but less than $1,000,000. The PSR also properly applies a two-level enhancement to Hamblin's offense level, pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), because the offense had more than 10 victims. After subtracting three points for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and (b), Hamblin's total offense level is 20, which at Criminal History Category I, yields a Guidelines Range of 33 to 41 months' imprisonment. Hamblin objects to the loss amount calculation, as well as the two-point enhancement for more than 10 victims.

#### 1.     The Loss Amount is More than $400,000 But Not More Than $1,000,000

The loss amount set forth in the PSR is based on the price of the paintings that Hamblin sold to the CW, totaling $275,000 ($65,000 for the Avery; $80,000 for the Gris; $45,000 for the

Hon. Loretta A. Preska
July 13, 2009
Page 3

Turner; and $85,000 for the Kline), as well as approximately $379,520 in losses resulting from Hamblin's other uncharged, but relevant, fraudulent sales.[1]

### a. Applicable Law

The standard of proof at sentencing is a preponderance of the evidence. *United States v. Garcia*, 413 F.3d 201, 220 n.15 (2d Cir.2005); *United States v. Gaskin*, 364 F.3d 438, 464 (2d Cir. 2004). "When making sentencing determinations, a district court may rely on any facts available to it, including information contained in the Pre-Sentence Report. Further, a sentencing court, like a jury, may base its factfinding on circumstantial evidence and on reasonable inferences drawn therefrom." *Gaskin*, 364 F.3d at 464 (citations omitted).

Additionally, the "sentencing court remains entitled to rely on any type of information known to it." *Concepcion*, 983 F.2d at 388, citing *United States v. Carmona*, 873 F.2d 569, 574 (2d Cir. 1989); *see also United States v. Brach*, 942 F.2d 141, 144 (2d Cir. 1991) ("sentencing court's discretion is largely unlimited either as to the kind of information [it] may consider, or the source from which it may come' ") (citation omitted); *United States v. Alexander*, 860 F.2d 508, 512-13 (2d Cir. 1988); U.S.S.G. §1B1.3; accord *United States v. Madkour*, 930 F.2d 234, 238 (2d Cir.) (information presented to a court "need only have sufficient indicia of reliability to support its probable accuracy' without regard to admissibility. . . ."), cert. denied, 502 U.S. 911 (1991), quoting U.S.S.G. § 6A1.3(a), and commentary; *see also United States v. Tracy*, 12 F.3d 1186, 1203 (2d Cir. 1993) (same); U.S.S.G. § 6A1.3, Commentary (sentencing judge may consider any information with "sufficient indicia of reliability"); Fed. R. Evid. 1101(d)(3) (sentencing judge not bound by rules of evidence).

Sentencing courts are permitted to make reasonable estimates off the loss amount based on the evidence put before the court. *See, e.g., United States v. Blount*, 291 F.3d 201, 215 (2d Cir. 2002) (estimating drug quantities); *United States v. Bryant*, 128 F.3d 74, 75-76 (2d Cir. 1997) ("In establishing sentencing tables that tie a defendant's offense level to the amount of loss caused by his offense, the Guidelines do not require that the sentencing court calculate the amount of loss with certainty or precision.") (citations omitted); U.S.S.G. § 2B1.1 cmt. n. 3(C) ("The court need only make a reasonable estimate of the loss" and may include in that estimate "[t]he approximate number of victims multiplied by the average loss to each victim"). That evidence can include patterns from which fraudulent conduct can be inferred. *See, e.g., United States v. Walker*, 191

---

[1] Since the PSR was issued, the Government agreed to remove certain transactions from its calculation of the relevant loss, and defense counsel also agreed to withdraw objections to certain transactions included in that amount, resolving all disputes as to the dollar amount of the relevant conduct. These revisions reduce the $379,000 listed in the PSR to $340,520. In the Government's view, this does not change the Guidelines range reflected in the PSR, but results in a slightly lower loss amount of $615,520.

F.3d 326, 331, 339 (2d Cir. 1999) (district court's finding that defendant was responsible for hundreds of false asylum applications was supported by INS official's testimony that the applications fell into regular patterns, such as including identical stories).

### b. Discussion

Hamblin argues that the loss amount is overstated in two ways. First, she argues that the amounts attributed to the fake Turner ($45,000) and for the Kline ($85,000) are unreliable because they are drawn from two unsigned contracts attached to an email that the CW sent to her on or about June 6, 2007. (Sent. Memo 8-9). Hamblin argues that the contracts were unsigned, and also suggests that the email itself was possibly fabricated because it does not appear in the results of a search warrant that the Government carried out on Hamblin's "Excite" email account (which, incidentally, Hamblin created under a fictitious name and address and shut down the same day that the FBI interviewed her about the fraud at her home). (*See* PSR ¶ 30).

First, a search warrant on an email account maintained by an internet service provider only yields the content of emails that remained in the account when the warrant was executed. Depending on the settings, emails are sometimes deleted automatically from email accounts and can also be deleted manually.

Second, there is plenty of other evidence suggesting that Hamblin and the CW discussed prices along the lines of those reflected in the unsigned contracts, and that they agreed on a sale. In a conversation that the CW recorded between himself and Hamblin on or about May 21, 2007 (several weeks before the CW sent the email to Hamblin attaching the unsigned contracts), the two parties discuss pricing.[2] First, the CW asks Hamblin how much she wants for "the LaTour" (which was not one of the paintings she ulitmately sold to the CW). Hamblin responds that the CW should come up with a price. He suggests $25,000 and she immediately agrees that a price of $20,000 to $25,000 was acceptable. Next, the CW asks how much Hamblin wants for the Kline. She responds that the Kline will be "much more." When the CW suggests $100,000, Hamblin agrees that a price in that range for the Kline is acceptable. Finally, Hamblin tells the CW that she will give him a slightly lower price if he purchases a group of paintings. Though the contracts attached to the CW's email to Hamblin that same day were unsigned, she shipped the Kline and the Turner to an art storage facility in New York on June 7, 2007 (the day after the contracts were emailed to her) for the purpose of the CW's resale of the paintings to a gallery owner in New York, suggesting that an agreement had in fact been reached. (PSR ¶ 22). In addition, the amounts attributed to the Turner and Kline are fairly consistent with what the CW actually paid for the Avery – $65,000, and with the $80,000 at which Hamblin priced the Gris (memorialized in one of her emails sent from the "Excite" account). (PSR ¶¶ 18(c), 38).

---

[2] The audio recording of this conversation was provided to the Probation Department but is not specifically described in the PSR.

The additional fraudulent sales that the Government and the Probation Department include as relevant conduct to be considered as part of the loss amount, falls safely within the dictates of Guidelines Section 1B1.3, which recommends that courts consider the entire range of the defendant's conduct, noting that even "[c[onduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range." U.S.S.G. § 1B1.3, comment (backg'd). The Second Circuit has recognized that the relevant conduct provisions contained in Section 1B1.3(a) are to be determined "broadly," to include, among other things, conduct for which the defendant was acquitted; conduct related to dismissed counts of an indictment; conduct that predates that charged in the indictment; conduct not charged in the indictment; conduct outside the statute of limitations; and conduct that violated state law. *United States v. Silkowski*, 32 F.3d 682, 688 (2d Cir. 1994) (citations omitted); *see United States v. Fitzgerald*, 232 F.3d 315, 320 (2d Cir. 2000) (upholding inclusion of state tax losses when fixing total tax loss, and upholding consideration of embezzlement losses although not part of count of conviction); *United States v. Bove*, 155 F.3d 44, 48 (2d Cir. 1998) (proper to include uncharged relevant conduct in fixing tax loss); *United States v. Martin*, 157 F.3d 46, 50 (2d Cir. 1988) (holding that "federal district court may consider any relevant conduct when sentencing a defendant, whether or not the conduct is a federal crime" and affirming consideration of possession of stolen but un-transported property); *see also United States v. Cianci*, 154 F.3d 106 (3d Cir. 1998) (Section 3B1.3 enhancement appropriate as "relevant conduct" even though not based on count of conviction).

### 2. The Defendant Should Receive a Two-Level Enhancement because the Offense Involved More than 10 Victims.

The application notes to U.S.S.G. § 2B1.1 define "victims" of a fraud offense to include "any person who sustained any part of the actual loss determined under subsection (b)(1)," *id.* cmt. n. 1, and goes on to define actual loss as "the reasonably forseeable pecurinary harm tht resulted form the offense," *id.* cmt. n.3(A)(i), and "pecuniary harm" as "harm that is monetary or that otherwise is readily measurable in money," *id.* Cmt. N.3(A)(iii). The application notes also state that "pecuniary harm does not include emotional distress, harm to reputation, or other non-economic harm." *Id.*

Hamblin objects to the application of a 2-point enhancement under U.S.S.G. § 2B1.1(b)(2)(A), because she argues that the number of victims who bore an "actual loss" is 13. (Sent. Memo. 11). Putting aside the fact that 13 is still greater than the 10 victims required to warrant the two-point enhancement (which, in the Government's view, dispenses with any issue over its application), even the victims who succeeded in getting their money back from Hamblin bore financial losses that were reasonably foreseeable as a result of her fraud, making them "victims" for the purpose of U.S.S.G. § 2B1.1(b)(2)(A). In *United States v. Abiodun*, 536 F.3d 162, 168 (2d Cir. 2008), the Second Circuit made clear that even "individuals who have been fully reimbursed for their financial losses may be deemed victims for the purposes of the sentencing enhancement set forth at U.S.S.G. § 2B1.1(b)(2)." In *Abiodun*, the Second Circuit affirmed Judge

Chin's finding that "individuals whose credit information defendants stole had to spend an appreciable amount of time securing reuimbursement from their banks or credit card companies and determined that this 'loss of time' could be measured in monetary terms." 536 F.3d at 169. Here, many of the victims who successfully demanded their money back from Hamblin spent considerable time and money in doing so. One victim (Daniel Liberman) even had to resort to litigation against Hamblin to get his money back. (*See* Exhibit 1).

Accordingly, the application of a 2-point enhancement under U.S.S.G. § 2B1.1(b)(2)(A), as set forth in the PSR, is correct.

### B. The Defendant's Health Issues Do Not Warrant a Non-Custodial Sentence

Hamblin argues that she has various physical and emotional ailments that warrant a non-custodial sentence because incarceration would exacerbate those conditions. (Sent. Memo. at 14, Ex. 3). The Court should reject this argument.

Hamblin offers two letters to support this claim – one from her physician, Sandra M. Sweetman, M.D., and the other from her therapist, Sylvia Gordon, LICSW. According to Dr. Sweetman, Hamblin suffers from cardiovascular conditions, including atrial fibrillation and heart palpitations, which make incarceration "risky" for her. (Sent. Memo, Ex. 3) According to Gordon, Hamblin's grief resulting from the death of her parents and anxiety about the criminal case warrants an "alternative sanction" to incarceration. (Sent. Memo., Ex. 3).

Post *Booker*, the Court may consider Hamblin's physical condition in determining an appropriate sentence. Health-based departures, however, are "discouraged" under the Sentencing Guidelines. Section 5H1.4 of the Guidelines provides:

> Physical condition . . . is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range. However, an extraordinary physical impairment may be reason to impose a sentence below the applicable guideline range; *e.g.*, in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.

A district court, having recognized its power to depart under § 5H1.4, may refuse to do so if it finds that a defendant has failed to meet his burden of proving that he has an "extraordinary physical impairment" that warrants a departure. The Second Circuit held that "in order to warrant a departure resulting in a nonincarceratory sentence on the basis of an extraordinary health condition, the 'defendant must be seriously infirm with [a] medical condition that cannot be adequately cared for by [the] Bureau of Prisons...'" *United States* v. *Cutler*, 2008 WL 706633 (2d Cir. 2008), quoting *United States* v. *Martinez*, 207 F.3d 133, 139 (2d Cir.2000), citing *United States* v. *Altman*, 48 F.3d 96, 104 (2d Cir.1995). In *Cutler*, the defendant (Friedman) had a

Hon. Loretta A. Preska
July 13, 2009
Page 7

serious heart condition and had suffered from sepsis prior to his sentencing. The Second Circuit reversed the District Court's granting of a downward departure, finding that the Court had erroneously assessed the medical evidence and that there was no support for the Court's view that the BOP could not care for the defendant. *Cutler*, 2008 WL 706633 at *38.

Health problems – even severe ones – that simply require monitoring and are capable of being monitored and treated by the BOP are not extraordinary physical impairments warranting a departure. See *United States* v. *Napoli*, 179 F.3d 1, 17 (2d Cir. 1999). Those health problems include serious coronary ailments. *United States* v. *Altman*, 48 F.3d 96, 104 (2d Cir. 1995).

Viewed against the foregoing standards, Hamblin's health condition does not call for a departure or non-Guidelines sentence under 18 U.S.C. § 3553(a). The BOP has reviewed the letters from Dr. Sweetman and Ms. Gordon that Hamblin submitted with her sentencing memorandum, and has plainly indicated that it will be able to provide appropriate care for Hamblin should he be incarcerated in a federal correctional facility. *See* Letter from Barbara Cadogan, Health Care Systems Administrator, Bureau of Prisons (attached as Exhibit 2).

### C.   The Defendant Should Receive a Sentence Within the Correct Guidelines Range of 33 – 41 Months

#### 1.   Applicable Law

The Guidelines still provide strong guidance to the Court in light of *United States* v. *Booker*, 543 U.S. 220 (2005) and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005), although they are no longer mandatory: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" – that "should be the starting point and the initial benchmark." *Gall* v. *United States*, 128 S. Ct. 586, 596 (2007). The Guidelines' relevance throughout the sentencing process stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives[.]" *Rita* v. *United States*, 127 S. Ct. 2456, 2463 (2007). After making the initial Guidelines calculation, a sentencing judge must then consider seven factors outlined in Title 18, United States Code, Section 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing outlined in Section 3553(a)(2). *Gall* v. *United States*, 128 S. Ct. at 596-97.

Courts may not presume that the appropriate sentence necessarily lies within the Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 128 S. Ct. at 596-97 & n.6. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the

extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* at 597.

### 2. Discussion

The Government submits that a sentence within the Guidelines range of 33 to 41 months would be sufficient, but not greater than necessary, to comply with several specified purposes of sentencing. Specifically, a sentence of this magnitude is necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence, and to protect the public. *See* 18 U.S.C. § 3553(a).

Hamblin's sale of the four charged paintings in this case was not by any means an isolated instance of fraud. She had been carrying out her scheme for years – purchasing decorative paintings worth very little, and falsely representing to buyers (usually advertising over the internet) that they were in fact valuable works of art. She continued her fraud relentlessly. After discovering that the paintings were fake, buyers would routinely demand their money back, with limited success. On the few occasions when Hamblin did refund money to a buyer for one of these fraudulent paintings, she would then turn around and re-sell the painting to another buyer, again, falsely representing that it was a valuable work of art. In fact, some of sales charged in the Indictment were of paintings that Hamblin had sold to Daniel Liberman – who sued her to finally recoup his $151,000.

A below-Guidelines sentence in this case (particularly a sentence of probation or home confinement as Hamblin seeks), would fail to reflect the seriousness, nature, and circumstances of the defendant's criminal conduct and would not provide her with the punishment her conduct warrants. *See* 18 U.S.C. §§ 3553(a)(1); 3553(a)(2)(A). A sentence below the Guidelines range in this case also would frustrate Congress's directive that sentences provide meaningful deterrence. *See* 18 U.S.C. § 3553(a)(2)(B). A substantial sentence is not only necessary for the purpose of general deterrence – to send a strong message to individuals who carry out similar frauds -- but is necessary to provide individual deterrence to this defendant, whose conduct demonstrated a blatant, and repeated disregard for the law.

Hon. Loretta A. Preska
July 13, 2009
Page 9

## Conclusion

For the foregoing reasons, the Government respectfully submits that a sentence of 33 to 41 months' imprisonment would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

Respectfully submitted,
LEV L. DASSIN
Acting United States Attorney
Southern District of New York

By:    /s/ S.R.

Seetha Ramachandran
Assistant United States Attorney
(212) 637-2546

cc:    Richard S. Berne, Esq.
*Counsel for the defendant*